IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KYLE CASSLER, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | No. 12-5015 |
|     Commissioner of the | : | |
|     Social Security Administration, | : | |
|     Defendant. | : | |

**REPORT AND RECOMMENDATION**

TIMOTHY R. RICE                                                                                          May 14, 2014
U.S. MAGISTRATE JUDGE

Kyle Cassler alleges the Administrative Law Judge ("ALJ") erred in denying his application for child's insurance and Supplemental Security Income ("SSI") by: (1) failing to adequately explain his finding that Cassler did not meet or equal the Listing of impairments[1]; (2) rejecting the medical evidence without good reason or adequate explanation; and (3) rejecting Cassler's testimony without good reason or adequate explanation. See Pl.'s Br. (doc. 11) at 2-11.

After careful review, I find the ALJ's decision was not supported by substantial evidence because the ALJ failed to consider any medical evidence when assessing whether Cassler's impairments met or equaled the Listing of impairments. Accordingly, I respectfully recommend that Cassler's request for review be granted.

---

[1]     The Listing of Impairments in Appendix 1, Subpart P, Part 404 of 20 C.F.R. is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background. Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The Listing defines impairments that would prevent an adult, regardless of age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity. Id.; 20 C.F.R. §§ 404.1525(a), 416.925(a) (purpose of the Listing is to describe impairments "severe enough to prevent a person from doing any gainful activity"). The Listing was designed to operate as a presumption of disability, making further inquiry unnecessary. Sullivan, 493 U.S. at 532.

PROCEDURAL HISTORY

Cassler applied for child's insurance benefits and supplemental security income on June 30, 2009, five months before his 21st birthday. R. at 159-61, 198. After a January 2011 hearing, the ALJ denied benefits in a February 2011 decision, utilizing the five-step sequential evaluation process.[2] Id. at 19-28. The ALJ determined that Cassler had seven severe mental impairments: borderline intellectual functioning, dysthymic disorder, personality disorder, attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder, and bipolar disorder, as well as scoliosis and obesity that were not severe.[3] Id. at 21-22. Nevertheless, the ALJ determined that Cassler's combined impairments did not meet or equal the Listings, and that he had the Residual Functional Capacity ("RFC") to perform work at all exertional levels with a long list of

---

[2]   The ALJ considers whether a claimant: (1) engaged in substantial gainful employment; (2) has severe impairments significantly limiting her ability to perform basic work; (3) has impairments satisfying the regulations' listed criteria; (4) has a Residual Functional Capacity ("RFC") to perform work within her limitations and can return to her previous work; and (5) can perform other work in the national economy. See §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

[3]   Borderline intellectual functioning occurs in people with IQ's between 71 and 84. Diagnostic and Statistical Manual of Mental Disorders IV-TR ("DSM IV-TR ") 740 (4th ed. Am. Psychiatric Assoc. 2000). Dysthymic Disorder is a "chronically depressed mood." Id. at 376. "A Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of an individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." Id. at 685. Individuals with ADHD display a developmentally inappropriate "persistent pattern of inattention and/or hyperactivity-impulsivity." Id. at 85. ADHD can manifest with predominantly inattentive, predominantly hyperactive, or combined features. Id. Post-traumatic stress disorder consists of "re-experiencing the traumatic event, persistence avoidance of stimuli associated with the trauma and numbing of general responsiveness, and persistent symptoms of increased arousal" that occurs in response to an "extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity;" or witnessing such an event, or learning about such an event being experienced by a "close associate." Id. at 463. Individuals with bipolar disorder experience alternating manic episodes, in which "there is an abnormally and persistently elevated, expansive, or irritable mood," and major depressive episodes, in which "there is either depressed mood or the loss of interest or pleasure in nearly all activities." Id. at 349, 357, 382.

nonexertional limitations.[4]  Id. at 23.  The ALJ relied on testimony from a vocational expert to establish that, even with these limitations, Cassler could still perform and find work as a laundry laborer, general hotel housekeeper, or addresser.  Id. at 27.

## FACTUAL HISTORY

Cassler's difficulties were first noticed in kindergarten, where he first had trouble paying attention and following rules.[5]  Id. at 323.  By first grade, "his behavior ha[d] gotten so bad that he [was] now sitting in total isolation at lunchtime," and he tested for and was provided special education services.  Id. at 283, 323, 336.  His test scores were below average in elementary school, although not below the 22nd percentile.  Id. at 284 (March 1995 Iowa Test of Basic Skills: composite percentile rank of 26), 302 (1999 P.S.S.A. scores: 22nd percentile in reading, 36th percentile in math).

In middle school, Cassler received generally poor grades and was given repeated detentions and suspensions for misbehavior in class, on the bus, and on school grounds.  Id. at 278-80, 300, 303-06, 309, 310, 311, 314.  Some members of his special educational team noted

---

[4]  Those limitations are: 1) unskilled work; 2) simple routine tasks; 3) short simple instructions; 4) work that needs little or no judgment to do; 5) simple duties that can be learned in a short timeframe; 6) only simple work-related decisions; 7) few workplace changes; 8) no more than occasional level direct face-to-face interaction with co-workers on the completion of an assigned task or duty (although this does not preclude routine daily interaction face-to-face with co-workers); 9) no more than occasional level direct face-to-face interaction with the general public in jobs that require math calculations; 10) no work around or with hazardous machinery or hazards; and 11) no work at a production rate pace.  Id. at 23.

[5]  The Commissioner argues that any evidence pertaining to the period of time before the alleged onset date of October 31, 2008 is irrelevant.  Def. Br. at 6.  Cassler, however, has not alleged disability based on an injury that occurred on a particular date; he has alleged life-long mental impairments that have impeded his success in school and work.  R. at 191 (alleging attention deficit disorder, learning disorder, and adjustment disorder with depression, beginning in 1994).  Moreover, a psychiatrist consulted by the Social Security Administration specifically recommended obtaining previous treatment notes and school records to assess Cassler's impairments.  Id. at 445, 460.

he was "unable to function in large group settings," and had a "significant problem with self-control and social skills," while others reported he "has the IQ to do the work but doesn't want to use his time wisely." Id. at 323-24. Cassler scored "below average" and "somewhat below average" on the various sections of a Cognitive Abilities Test administered in April 2001, although all of his scores put him above the 10th percentile. Id. at 277, 299. In April 2002, he was arrested and placed on probation for threatening to shoot several students who had been harassing him on the school bus, and he finished that year with 7 D's, 2 C's, a B, and a B+, and a comment from one teacher that he "displays minimal effort." Id. at 272, 348.

Before he entered high school, in August 2002, Cassler suffered significant burns when he threw fuel into a fire and it exploded onto his face, arm, and chest. Id. at 427, 430. In a September 2002 psychological evaluation, he was diagnosed with ADHD, Adjustment Disorder with Depression, and Learning Problems, and given a GAF score of 46.[6] Id. at 268. He was described as "hard-working," but it was recommended that he continue to receive treatment of three hours per week with a mobile therapist and behavioral specialist, and eight hours per week with therapeutic staff support because "[a]ll he has known is what his father has taught him and to some degree he is trying to live up to his father's expectations." Id. at 264, 269.

Cassler continued to get multiple suspensions, including a suspension in March 2003 for threatening to take a gun to school and kill another student. Id. at 285-86, 288-90, 549. In April

---

[6] GAF scores (on a 100-point scale) reflect the mental health specialist's assessment on a particular day of the severity of a patient's mental health, and are based on the patient's state of mind and symptoms. Diagnostic and Statistical Manual of Mental Disorders IV-TR ("DSM IV-TR ") 34 (4th ed. Am. Psychiatric Assoc. 2000). Scores between 31 and 40 reflect "some impairment in reality testing or communication" or "major impairment in several areas," while scores between 41 and 50 reflect "serious symptoms" or "any serious impairment in social, occupational, or school functioning." Id. Scores between 51 and 60 reflect "moderate symptoms" or difficulties, while scores between 61 and 70 suggest a patient is "generally functioning pretty well." Id.

2003, he was admitted to the KidsPeace Acute Partial Hospitalization Program, where he acknowledged that his father used to physically discipline him and that he was not taking his medications consistently.  Id. at 547, 552.  At KidsPeace, he was diagnosed with ADHD, Combined type, Depression, NOS and given a GAF score of 40.  Id. at 547.  He reported that he wanted to become a truck driver, and was described as having "long-standing difficulties with hyperactivity, impulsivity, aggression, poor judgment, poor social skills and distractibility."  Id. at 548, 553.  Staff noted that "[h]is behaviors have escalated over the last year despite trials of medication and despite Wrap Around Services . . . he becomes easily angered and explosive when he is angered."  Id. at 548.  Cassler's doctor concluded that, although "his medications sound reasonable, apparently [Cassler] has not been taking them consistently."  Id.

     Cassler improved significantly in the Acute Partial Hospitalization program, despite engaging in a physical altercation with his father, who had "pulled down [Cassler's] shorts in a playful manner, which led to the incident."  Id. at 559.  He told his doctors "the medication has helped him at being calm and in control of his emotions," and he reportedly "walked away" from a potential incident on a basketball court, "showing increased coping skills."  Id. at 559, 563.  When it was time to be discharged into sub-acute care, Cassler objected that he was not ready.  Id. at 561.  In the sub-acute program, his behavior was once again unacceptable, and he was found "to be at risk for dangerous behaviors toward himself and others."  Id. at 564.  Prescribed changes in his medication regime were delayed, apparently due to his mother's logistical problems implementing them.  Id. at 565.  He failed multiple classes that year.  Id. at 262.

     Cassler started the 2003-04 school year at the KidsPeace School-Based Partial Hospitalization Program, where his blood was tested to ensure that his medications were at therapeutic levels, and his outbursts were reduced, although not eliminated.  Id. at 466.  In

February 2004 he was discharged from KidsPeace and referred to the Alsace Program.  Id. at 570.  Family-Based Services were continued while a private school setting was sought for him "due to his ongoing conflicts with his father."  Id. at 570.  "As a result of [Cassler's] lack of progress and his very frequent disruptive behavior, transfer to an approved private school setting has been recommended."  Id.

In his re-evaluation for special educational services in February 2004, Cassler was described as "capable of doing grade level work," although he "needs to be the center of attention."  Id. at 321.  "He seem[ed] to have trouble keeping on task . . [and would] act inappropriately whenever he [felt] ignored or demand[ed] attention."  Id. at 322.  After leaving KidsPeace in February, Cassler did not enroll in another psychological treatment program until the following October.  Id. at 342.  Meanwhile, Cassler's case manager noted that he was reporting potential medication side effects, but she was "uninclined to address this problem."  Id. at 533.  Cassler attended "corrections camp" that summer, and spent 10 days in detention at the Berks County Youth Center in September 2004.  Id. at 260, 410.

In the fall of the 2004-05 school year, Cassler was again diagnosed with ADHD, Combined type, with a rule out of Dysthymic Disorder.  Id. at 349.  He also returned to Hamburg Area High School for two quarters, where he again received multiple suspensions and detentions.  Id. at 248-53.  Almost all of his coursework was incomplete as of January 2005, and his teachers complained he was "absent too often."  Id. at 255.  He began working at Burger King that month, and in a physical examination undertaken in connection with that employment his provider noted his "history of oppositional defiant disorder."  Id. at 407.  Cassler reported taking Depakote, Adderall, and Lexapro, and that he was under home arrest for violating probation and was wearing an ankle bracelet.  Id. at 407-08.  His only physical complaint was a history of a

6

ruptured ligament in his right knee, for which he was given a knee brace.  Id. at 407.

Cassler was enrolled in the Alsace program for the third quarter of the 2004-05 school year, and a February 2005 interim report noted that he was "failing because he does not complete his assignments or tests."  Id. at 256.  His teacher advised that Cassler "needs to stop his excessive talking and do his work."  Id.  In March 2005, Cassler was officially expelled from Hamburg High.  Id. at 348.  He was sent to Berks County Youth Center for violating his probation and, although he was not present long enough to receive grades, he expressed his goal of finishing high school and becoming a mechanic, and was found to read at grade level.  Id. at 318, 343.  He was then transferred to Northwestern Academy's Boot Camp for three months, and given an "unsuccessful discharge" from that facility.  Id. at 339, 349.  He was described as having problems with "lying and stealing," and "authority."  Id. at 343.  After leaving boot camp, Cassler began refusing to take his medications, and a new psychiatrist prescribed Adderall, Depakote, and Lexapro and diagnosed him with ADHD, Combined type, conduct disorder, and Depression NOS with a GAF score of 45.  Id. at 342, 345.

Cassler began the 2005-06 school year in the Alsace program, and was almost immediately "beat up after he got off the bus at school by two classmates."  Id. at 406.  Directly after the assault, his primary care provider described him as "oriented to person, but not place or time," and he denied any loss of consciousness to the providers at the Emergency Room.  Id. at 383, 406. In October 2005, he reported that he was taking his Adderall, Depakote, and Lexapro, and that the medication "seem[ed] to be controlling him fairly well" despite his "history of anger management and anxiety disorder."  Id. at 383, 405.  Sometime in late October or early November 2005, Cassler was discharged from probation.  Id. at 339.

In late November 2005, Cassler was also discharged from the Family Based Program at

Milestones Community HealthCare Inc. because he had stopped taking his prescribed Hyoscyamine, Seroquel, Adderall, and Depakote, and was "not [] actively working on his treatment plan." Id. at 355-66. His providers noted he had made "no progress . . . on accepting responsibility for his actions," and referred him to outpatient services. Id. at 356. He was assigned a GAF score of 50 at discharge. Id. at 355. Although he had a case manager to coordinate his educational services from Alsace and outpatient services from his new provider, St. Joseph's clinic, the providers at Milestones noted that it was "unclear whether or not [Cassler] will continue with services following discharge, as he has been noncompliant with services in the past." Id. at 339-40.

At a school physical in February 2006, Cassler reported taking Depakote, Adderall, and Lexapro, and his provider noted that "some hygiene issues have been discussed and he could improve them." Id. at 400-01. Cassler left his job at Burger King in March 2006. Id. at 202. He received a head CT after being hit in the back of his head with a stick during a fight in April 2006. Id. at 381, 397-98. He failed the Alsace program after the third quarter of the 2005-06 school year, and on the 2006 P.S.S.A. tests he scored below basic on reading and math. Id. at 202, 234-35.

Cassler does not appear to have enrolled in school for 2006-07, and stopped taking his medications that fall. Id. at 378, 436. His father died on March 1, 2007. Id. at 182. In March 2007, Cassler told his primary care providers that he "occasionally" smoked marijuana, and was diagnosed with a hernia that led to an ER visit in July 2007. Id. at 377, 392. In August 2007, he reported taking Seroquel and Strattera. Id. at 386. He started and almost immediately left two jobs at fast food restaurants in July and September 2007, and received another head CT in September 2007 after hitting his head on a pipe in his basement. Id. at 192, 202, 372.

8

Cassler began working at a logging and saw mill in November 2007, and in March 2008 worked for a few days at an industrial timber wood shop and about a month at a diner. Id. at 202. He left his job in April 2008, after being knocked unconscious by a big log "because [he] wasn't focusing on what [he] was supposed to do." Id. at 41-42, 202. On October 30, 2008, Cassler was incarcerated in Berks County for 11 days for driving without a license. Id. at 440. While incarcerated he was put on full suicide precautions, found crying, and reported hearing his mother's voice. Id. He was at that point taking no medications. Id. at 436. Cassler's daughter was born around March 2009. Id. at 35.

In July 2009, Cassler applied for Pennsylvania temporary disability benefits with the support of a Dr. Phan, based on diagnoses of Adult ADHD and Bipolar disorder for the period of August 2009 through February 2010. Id. at 442. Cassler was then treating with Adderall. Id. at 443.

In an August 2009 social security benefits application, Cassler described his daily routine as looking for jobs, sleeping outside because his mom and landlord did not want him at her house, taking care of his dog with help from his mom, who also makes him shower and handles his medications, and handling only the household chores of burning the trash and sweeping, which takes two hours every day but "sometimes it doesn't get done cause [sic] I go do something else." Id. at 210-12. Although Cassler reported that he could not drive and was not able to pay bills, handle a savings account or use a checkbook or money orders, he did report spending money on his hobbies and toys, which included RC cars, model cars, and real cars, and which he used every day. Id. at 213-14. He stated he could pay attention for only 2-3 seconds, was unable to follow spoken or written instructions, and described himself as "very moodie [sic] and angry, sometimes physically and emotionally abusive. I feel like a kid. I'm not a

9

responsible person.  People tell me to do something I don't pay attention and I look around.  I have racing thoughts.  Can't [sic] really sleep, or eat right."  Id. at 215-17.  Cassler's mother wrote that his "IQ is very low because of being toss[ed] from one school to another. . . .[he] does have a learning disability, coping with every day living (checkbook, pills, budgeting) is very difficult for him."  Id. at 219.

After reviewing Cassler's case on September 4, 2009, Dr. Barry Rudnick found there was insufficient evidence to determine the severity of Cassler's mental impairment, and recommended obtaining current treatment notes.  He suggested that, "[i]f none are available," the agency should obtain "a psychiatric evaluation containing a detailed discussion of ADLs, a discussion of drug use and a detailed mental status."  Id. at 445.  Ten days later, Dr. Rudnick received additional records and stated that Cassler's "ADD was noted to be improved in records from 2007 . . . The claimant's ADD and depression do not appear to be severe.  The [learning disability] allegation has not been adequately addressed in [the medical records].  School records should be obtained.  If these are not recoverable then [intellectual functioning] testing would be helpful."  Id. at 460.

In a November 2009 function report, Cassler added depression to his claimed mental impairments, and reported that he had been going to Berks Psychiatry Inc. in Reading and seeing psychiatrist Rahman Kahm once each month and Jamie, his therapist, twice each month.  Id. at 223.  He reported sleeping a lot "so I don't have to do anything," and that he had lost interest in his hobbies.  Id. at 224.

On December 4, 2009, Cassler had a consultative examination with Michael Mosko, Psy.D.  Dr. Mosko diagnosed Cassler with Axis I issues of Bipolar II Disorder, Depressed, Severe without psychotic features, Dysthymic Disorder, and Posttraumatic Stress Disorder, Axis

II issues of Personality Disorder NOS and Borderline Intellectual Functioning, Axis III issues of a history of physical trauma, and a GAF score of 51.  Id. at 473.  Dr. Mosko opined that the Axis I issues could be resolved in six to 12 months, the Axis II issues in 24-36 months.  Id. at 475.  Dr. Mosko found that Cassler had a Full Scale IQ of 74, which indicates borderline intellectual functioning.  Id. at 471.  He noted that, given Cassler's history of head injuries, he "might have sustained neurological damage that impacts on his impulse control and judgment."  Id. at 474.  In assessing the limiting effects of Cassler's mental impairments, Dr. Mosko found only slight impairments, but noted that "these deficits become more pronounced when affectively overwhelmed based on self-report and [the evidence of record]."  Id. at 477.

Approximately one week later, Dr. Junko McWilliams completed a psychiatric review technique of Cassler's case for the social security administration and assessed moderate limitations in social functioning and maintaining concentration, persistence, or pace, and mild limitations in activities of daily living.  Id. at 498-500.  He opined that Cassler had no "c" criteria and therefore did not meet the Listing.  Id.

In January 2010, Cassler applied for another round of Pennsylvania temporary disability benefits for the period of January 2010 through July 2010 with the support of his psychiatrist, Dr. Khan.  Dr. Khan based the application on diagnoses of Adult ADHD and bipolar disorder, and noted that Cassler needed Depakote, Seroquel, and Adderall.  Cassler added, "I have a low IQ due to my illness . . . . I can't comprehend what people say for me to do things [sic].  I can't focus on things do [sic] to racing thoughts.  I can't keep a job for [sic] very long time."  Id. at 545.

Cassler's psychiatry records indicate that the "meds [were] working fairly well" and "all meds [were] helpful" in March and April 2010.  Id. at 528.  Nonetheless, in late April, Cassler,

who then reported taking Buspar, Klonopin, Seroquel, Depakote, and Adderall, hit his girlfriend and then hit his own hand with a wrench out of guilt. Id. at 538-39.  In June 2010, he reported getting violent with his cousins and noted that he had "been out of [his] medications," stating that he might have been able to avoid the confrontations medicated. Id. at 527.  He requested hospitalization, and his therapist found that he posed a homicidal risk, stating "I am convinced client is sincere about getting help and if it can be arranged [he] should be placed!" Id.

On July 6, 2010, Cassler entered the Reading Hospital Center for Mental Health's Partial Hospitalization program, but was discharged on July 23rd after attending on a sporadic basis because of transportation issues, and displaying a low level of engagement, medium level of response, and medium level of motivation. Id. at 529-30.  He was found to have a GAF of 55, with the highest of the previous year of 65, and given a guarded prognosis. Id. at 530.  Dr. Khan filled out a Pennsylvania "health-sustaining medication assessment form" for Cassler on August 9, 2010, requesting lithium for his bipolar disorder and finding him temporarily disabled from October 2010 to April 2011. Id. at 511-12.

Cassler tested positive for marijuana on August 10, 2010, negative on August 19, and in September 2010 he reported to his therapist that he was facing charges for beating up his cousin and attempting to assault his girlfriend. Id. at 524.  Later that week, Cassler told a psychiatric provider "he was frustrated/angry ever since he stopped taking his meds," and was diagnosed with ADHD and bipolar disorder, and assigned a current GAF of 60 (30 for the past year). Id. at 520-22.

Cassler tested positive for marijuana again on September 20, 2010, and complained to his therapist later that month that his girlfriend had stopped paying attention to him once she obtained her drivers license. Id. at 519, 537.  His therapy notes reflect "a little progress" made

on October 12, 2010, but "no progress" on October 26, 2010. Id. at 516-17. On November 9, 2010, he reported that he had found a new house to move into with his girlfriend, and passed a urine test. Id. at 515, 536. On November 23, 2010, he reported that he had fought with his girlfriend over Thanksgiving and punched a hole in the closet door, and on November 29, 2010, his therapist described him as "overwhelmed at times." Id. at 514, 516. By December 2010, he had moved into the new house with his girlfriend and daughter and passed another drug test. Id. at 513, 535.

At his hearing in January 2011, Cassler reported that he lived with his girlfriend and 22-month old daughter. He stated that "sometimes [he] wake[s] up in the morning and [he's] angry and [he's] just mad at the world." Id. at 37. He reported having "a problem with hitting people," but admitted that the medications "do help," explaining "once I take my meds and in like 20 minutes I feel better." Id. at 37-38. He does not take public transportation, does not have a drivers license, and does not grocery shop for himself. Id. at 39. While his girlfriend works, he spends the day taking care of his daughter by watching TV with her, playing cards, and helping her dress her dolls. Id. at 45-46. He is also able to vacuum and cook food in the microwave, but he burns things he tries to make on the stove, because he cannot pay attention. Id. at 40, 48. His girlfriend reminds him to take care of his personal hygiene. Id. at 40. His hobbies consist of playing with remote control cars and putting together model cars either by himself or with his daughter. Id. at 41. Although he is able to construct model cars without the use of instructions, Cassler testified that he would be unable to work at an auto repair shop because he would be unable to "focus on one thing at one time." Id. at 50. He reported using marijuana four months earlier when he was "depressed," but claimed to have given it up "for the interest of my self and my daughter, basically my family." Id. at 44. He also reported being hospitalized twice for self-

harm. Id. at 51. When asked about his work history, Cassler reported that none of his jobs could last long-term because "I couldn't really focus or I didn't like doing anything. I couldn't really like something that I didn't like." Id. at 53.

## DISCUSSION

A claimant is disabled if he cannot engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." §§ 404.1505(a), 416.905(a); see also Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 503 (3d Cir. 2009). The factual findings of the Commissioner must be accepted as conclusive if they are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla.'" Diaz, 577 F.3d at 503 (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). However, my review of legal conclusions is plenary and I can overturn an ALJ's decision for a legal error even if I find it was supported by substantial evidence. Payton v. Barnhart, 416 F. Supp. 2d 385, 387 (E.D. Pa. 2006). I may not weigh the evidence or substitute my own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011).

    I.    The ALJ failed to adequately explain his findings that Cassler did not meet the Listing of Impairments

Cassler argues that the ALJ's analysis of the "B" criteria of the mental Listings entirely ignores the medical evidence of record. Pl. Br. at 3. The Commissioner contends this argument

is flawed legally and factually, and that Plaintiff cannot meet the "B" criteria with medical records that cover only a nine-month period. Def. Br. at 6 (doc. 12).

To satisfy a Listing, a claimant's impairment must meet all of the specified medical criteria. Sullivan, 493 U.S. at 530. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Id.; Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004). Claimant must offer medical findings showing her impairments meet or medically equal a listed impairment. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 n.2 (3d Cir. 2000); see also Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (claimant bears burden of establishing steps one through four). "For a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan, 493 U.S. at 530 (emphasis omitted).

The ALJ assessed Cassler as having a mild restriction in activities of daily living, moderate difficulties in social functioning and concentration, persistence, or pace, and no episodes of decompensation. R. at 22. He based his assessment, however, entirely on Cassler's testimony at the January 2011 hearing and Exhibit 4E, a Function Report completed by Cassler on August 14, 2009. Id.

The ALJ must evaluate all relevant evidence in the record. Fargnoli v. Massanri, 247 F.3d 34, 41 (3d Cir. 2001); Burnett, 220 F.3d at 121; Cotter v. Harris, 642 F.2d 700, 704, 706 (3d Cir. 1981). The ALJ may not make speculative inferences from medical evidence, see, e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), and cannot reject evidence for no reason or for the wrong reason, Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505 (3d Cir. 2009). The ALJ must therefore explain the evidence supporting his findings and the reasons for discounting the

evidence he rejects. Id. at 505-06; Cotter, 642 F.2d at 705-06. This permits a reviewing court to determine whether significant probative evidence was improperly rejected or simply ignored. Burnett, 220 F.3d at 121; Cotter, 642 F.2d at 706-07.

The ALJ failed to reconcile the evidence that does not support his conclusions regarding Cassler's functional limitations. For example, Exhibit 17F, medical records from Berks Psychiatry covering the period from March through December 2010, includes evidence of verbal outbursts and physical violence, as well as the opinion of a medical professional that Cassler posed a homicidal risk. Id. at 514, 517, 526-27. The Commissioner argues that the ALJ was not required to address this evidence because it could not, by itself, establish an impairment of at least 12 months. Def. Br. at 6. The ALJ, however, is required to "show the significant history, including examination and laboratory findings," that informed his analysis of the functional limitations imposed by Cassler's mental impairments. §§ 404.1520a(e)(4), 416.920a(e)(4). Whether the therapist's concern about Cassler posing a homicide risk was lumped in with Dr. Kahn's opinion and, therefore, given "limited weight" because of its alleged incompatibility with uncited medical records is unknown. R. at 26. The ALJ's failure to address it renders his decision "impossible . . . to review." Fargnoli, 247 F.3d at 41.

In terms of activities of daily living, the ALJ fails to explain how his assessment is informed by the uncontradicted evidence that Cassler is unable to drive or use public transportation, and cannot handle his own finances. R. at 39, 219. When considering social functioning, the ALJ fails to address any of Cassler's long-standing behavioral problems or the nature of his severe personality disorder and bipolar disorder. See, e.g., 461-75. The ALJ's discussion of concentration, persistence, or pace, ignores Cassler's educational or work history. As for "episodes of decompensation," the ALJ failed to address whether he discounted or

16

disbelieved Cassler's testimony that he had been hospitalized for self-harm, or whether Cassler's enrollment in a "partial hospitalization" program should be considered an episode of decompensation. Id. at 51, 529-30, 549-54.

Finally, the ALJ entirely ignores Cassler's GAF scores in his Step 3 analysis, and in his Step 4 analysis mentions only Cassler's life-time high score of 65 without noting the GAF for the "past year" of 30 directly next to it on the same page. Id. at 25, 522. Although a claimant's GAF score does not have a "direct correlation to the severity requirements," Dougherty v. Barnhart, No. 05-5383, 2006 WL 2433792, at *9 (E.D. Pa. Aug. 21, 2006) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50764-65 (Sept. 20, 2000)), "GAF scores are used by mental clinicians and doctors to rate the social, occupational, and psychological functioning of adults," West v. Astrue, No. 09-2650, 2010 WL 1659712, at *4 (E.D. Pa. Apr. 26, 2010) (citing Irizarry v. Barnhart, 233 F. App'x 189, 190 n.1 (3d Cir. 2007)); see also Dougherty, 2006 WL 2433792, at *9 (GAF is "the scale used by mental health professionals to 'assess current treatment needs and provide a prognosis'") (quoting 65 Fed. Reg. at 50764). A GAF score, therefore, "constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability." Watson v. Astrue, No. 08-1858, 2009 WL 678717, at *5 (E.D. Pa. Mar. 13, 2009) (emphasis omitted) (citing Colon v. Barnhardt, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006)); Dougherty, 2006 WL 2433792, at *9.[7]

---

[7] The few cases in which an ALJ's opinion was affirmed despite a failure to mention GAF scores are distinguishable:

In Rios v. Astrue, for example, the ALJ mentioned a GAF score of 50 to 55 but failed to mention two additional GAF scores of 50. No. 09-5004, 2010 WL 3860458, at *8 (E.D. Pa. Sept. 30, 2010), aff'd Rios v. Comm'r Soc. Sec., 444 F. App'x 532, 535 (3d Cir. 2011). The

Here, Cassler offered GAF scores going back to 2002, at which point he was rated 46, with a high score over the previous year of 48. Id. at 268. In 2003, he was given a GAF of 40, with a highest of 55 over the past year, id. at 547, and in 2004 he was given a GAF of 50, which was also listed as his highest GAF rating of the previous year. Id. at 354. In 2005, Cassler was given GAF scores of 45 in July and 50 in November. Id. at 345, 355. In 2009, he was given a score of 51 by a consultative examiner, and 55 by a treating source who also noted that his highest GAF of the previous year was 65. Id. at 473, 530. Later that year, another treating source gave Cassler a GAF score of 60, but noted that it had fluctuated down to 30 in the past year.[8] Id. at 522. A GAF score of 30 indicates that an individual's "behavior is considerably

---

court in Rios explicitly distinguished West, Watson, Robleto, and Dougherty, where the ALJs either failed to address GAF scores at all or cherry-picked higher scores. Id. Like the ALJs in West and Dougherty, the ALJ here failed to mention those GAF scores indicating serious symptoms.

In Purnell v. Astrue, 662 F. Supp. 2d 402 (E.D. Pa. 2009), the ALJ failed to mention a treating physician's GAF score of 50, but the treating physician found only mild or moderate limitations in certain categories and no marked or extreme limitations for any categories. Id. at 414-15. Here, Cassler received a GAF score of 65, but his treating physician, who continued to declare him "temporarily disabled" for a period of more than 12 continuous months, also noted that his GAF score had been as low as 30 in the past year. See R. at 522.

In Hendrickson v. Astrue, No. 07-05345, 2008 WL 3539621 (E.D. Pa. Aug. 11, 2008), the ALJ failed to mention a GAF score of 45 to 48 but mentioned and discussed three subsequent GAF scores of 50 issued by the same physician. Id. at *4. Here, the ALJ mentioned a score of 65 while ignoring all lower GAF scores.

In Gilroy v. Astrue, 351 F. App'x 714 (3d Cir. 2009), an ALJ's failure to mention or discuss a one-time GAF score of 45 did not require remand where there was only one GAF score and it was not accompanied by any reports or notes indicating impairment. Id. at 716. Cassler's unmentioned GAF scores accompany notes documenting a long history of behavioral issues unacknowledged by the ALJ. See, e.g., R. at 520-22.

[8]    Failure to mention or discuss GAF scores in the 41 to 50 range merits remand. See, e.g., West, 2010 WL 1659712, at *6 ("[C]ase law in this district . . . [indicates] that remand is necessary where an ALJ fails to specifically discuss or examine a claimant's GAF scores.");

influenced by delusions or hallucination" or "serious impairment in communication or judgment," or displays an "inability to function in almost all areas." DSM-IV TR at 34. Although these scores do not require the ALJ to find Cassler disabled and award benefits, they do require the ALJ to reconcile them with his assessment of Cassler's functional capacity. See Fargnoli, 247 F.3d at 41; Burnett, 220 F.3d at 121; Cotter, 642 F.2d at 704. His failure to do so makes it impossible to determine how he came to his findings regarding Cassler's functional limitations.

II.     Cassler's Additional Claims

Cassler also argued that the ALJ rejected medical evidence without good reason or adequate explanation and failed to explain or substantiate his credibility assessment. Pl. Br. at 6-11. It is unnecessary to examine Cassler's additional claims. A remand may produce different results on these claims, making discussion of them moot. See Steininger v. Barnhart, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because ALJ may revise findings on remand).

Accordingly, I make the following recommendation:

---

Sojourner v. Astrue, No. 09-5662, 2010 WL 4008558, at *5 (E.D. Pa. Oct. 12, 2010) ("There are a long line of cases in the Eastern District requiring remand when an ALJ fails to explicitly address GAF scores in the 41-50 range."); Watson, 2009 WL 678717, at *6 ("[C]ase law from this district is . . . explicit that a remand is necessary when an ALJ fails to specifically discuss GAF scores."); Dougherty, 2006 WL 2433792, at *9 ("Because a GAF constitutes medical evidence accepted and relied upon by a medical source, it must be addressed by an ALJ in making a determination regarding a claimant's disability."); Span ex rel. R.C. v. Barnhart, No. 02-7399, 2004 WL 1535768, at *6 (E.D. Pa. May 21, 2004) (remanding on basis that "ALJ provid[ed] no explanation for discounting the significance of [plaintiff's] GAF scores").

## R E C O M M E N D A T I O N

AND NOW, this __ day of May, 2014, it is respectfully recommended that Cassler's request for review be GRANTED and the matter be REMANDED to the Commissioner for further review consistent with this report and recommendation. The Commissioner may file objections to this Report and Recommendation within 14 days after being served with a copy thereof. See Fed. R. Civ. P. 72. Failure to file timely objections may constitute a waiver of any appellate rights. See Leyva v. Williams, 504 F.3d 357, 364 (3d Cir. 2007).

BY THE COURT:

/s/ Timothy R. Rice
TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE